DAVIS, J.
 

 On November 20, 2001, an officer of the Baltimore City Police Department applied for and obtained a search warrant for the residence and vehicle of appellant Harold Ferguson. The warrant was executed on the same date and the search uncovered heroin and other contraband in appellant’s apartment. On December 5, 2001, appellant was charged by indictment in the Circuit Court for Baltimore City with conspiracy to distribute a controlled dangerous substance (CDS), conspiracy to possess with the intent to distribute a CDS, and conspiracy to possess a CDS. Also, on January 30, 2002, appellant was charged by indictment in the Circuit Court for
 
 *585
 
 Baltimore County with possession with intent to distribute a CDS and possession of a CDS.
 

 Appellant filed a Motion to Suppress Evidence in the Circuit Court for Baltimore City on January 22, 2002 and in the Circuit Court for Baltimore County on March 8, 2002. A suppression hearing was conducted before Judge Roger W. Brown in the Circuit Court for Baltimore City on October 3, 2002 and appellant’s motion was denied on October 10, 2002. Appellant then entered into a not guilty statement of facts on November 11, 2002 and, on January 13, 2003, he was found guilty and sentenced in the Circuit Court for Baltimore City to a term of fifteen years’ imprisonment, with all but five years suspended. Subsequently, appellant entered into a not guilty statement of facts in the Circuit Court for Baltimore County after that venue accepted Judge Brown’s ruling on his Motion to Suppress Evidence. On February 6, 2003, appellant was found guilty and sentenced in the Circuit Court for Baltimore County to a term of fifteen years’ imprisonment with all but five years suspended, to run concurrent with the sentence imposed by the Circuit Court for Baltimore City. On February 12, 2003, he filed his timely appeal, which is a consolidated appeal from his convictions in the Circuit Courts for Baltimore County and Baltimore City.
 

 Appellant presents one question for our review, which we rephrase as follows:
 

 Did the trial court err when it denied appellant’s motion to suppress evidence based on his Fourth Amendment protections against unlawful search and seizure?
 

 We answer appellant’s question in the negative and, therefore, affirm the trial court’s denial of the motion to suppress.
 

 FACTUAL BACKGROUND
 

 On November 20, 2001, Detective William Knoerlein of the Baltimore City Police Department applied for a search warrant in the District Court of Maryland for Baltimore City, requesting authorization to enter and search appellant’s apartment and vehicle. The affidavit submitted by Detective
 
 *586
 
 Knoerlein, which recites the facts central to the issuance of the search warrant, provided, in part:
 
 [1]
 

 On October 12, 2001, your affiant[,] along with Detectives Jendreck, Gladstone[,] and Bristol[,] applied for and received a Maryland State Court Ordered Wire Tap authorizing the interception of oral communications occurring over Sprint Spectrum cellular telephone number (410) 419-3215 (A-line) subscribed to Marvin Cantine 1534 Burnwood Road, Baltimore, Maryland 21239. Voice Stream Wireless Corporation telephone number (443) 527-3819 (B-line), and Sprint Spectrum cellular telephone number (443) 804-8500 (C-line) subscribed to Harvey Lippman 1303 Colbury Road Apartment E., Baltimore, Maryland[ ] 21239. The Honorable John N. Prevas, seated in the Circuit Court for Baltimore City signed the Court Order. [Cantine] and [Lippman] are known to your affiants to utilize these cellular telephones to facilitate their CDS distribution operation.
 

 A Criminal Record Check revealed:[
 
 2
 
 ]
 

 [Cantine] and [Lippman] have been identified in this Wire Tap investigation as kilogram quantity narcotics distributors in the Baltimore Metropolitan area as referenced in call number B-317 where an unknown male is calling [Lippman]. Just prior to [Lippman] picking up the phone, this unknown male is heard speaking with another individual in the background. In this call the unknown individual is heard saying
 
 *587
 
 “he want [sic] about 300 grams, yo [sic][.]” [Lippman] then answers the phone where he discusses with this individual about meeting up with him in a couple of hours. Your affiants, based on their training, knowledge, and experience[,] know that the term “grams” is associated with the weight measure consistent with the distribution of heroin in the Baltimore City Metropolitan area. Your affiants also believe that the unknown individual who is calling [Lippman] is trying to obtain from the individual in the background the amount of heroin he is going to need to order from [Lippman]. Based on this particular call your affiants believe that [Lippman] and the unknown male were arranging to meet to discuss and transact the CDS purchase.
 

 During the course of this investigation, your affiants have intercepted numerous communications on the aforementioned cellular telephones between [Lippman], [Cantine,] and other known and unknown CDS associates. One of [Lippman’s] and [Cantine’s] CDS associates known to your affiants is [appellant]. According to the intercepted calls, your affiants believe that [appellant] is a close and trusted CDS associate and is currently utilizing the address of 101 Aspinwood Wood [sic] Way, Apartment J as a location where he organizes the daily activities of his CDS organization with [Lippman] and [Cantine]. Your affiants also believe that based on the intercepted calls as well as surveillance[ ], [appellant] utilizes Aspinwood Way, Apartment J[,] for the storage and safekeeping of CDS, related proceeds[,] and documents. Your affiants also believe that [appellant] is utilizing his 2000 GMC Yukon[,] bearing Maryland registration of M619143 ... [,] to store and transport CDS related proceeds. Your affiants believe that [appellant] is using this vehicle on a daily basis for the purpose of his CDS transactions.
 

 On October 16, 2001[,] at approximately 12:59 p.m., reference is made to call number B-132 which was intercepted as an outgoing call, no number was displayed or subscriber information available. During the conversation, [Lippman] spoke to an individual later identified as [appellant] and
 
 *588
 
 stated[,] “You [sic] ready to see me?” [Appellant] responded, “Yeah [sic] or I would not have called you[.]” [Lippman] then replied, “We can just take care of everything[.]” [Lippman] then advised [appellants ] that he would call him back in twenty or twenty[-]five minutes. Based on your affiantsf] training, experience^] and expertise in the field of narcotics[,] your affiants believed that [Lippman] was going to meet with [appellant] to obtain a large quantity of United States Currency which were the proceeds from narcotics sales. Your affiants know that persons involved in the distribution of narcotics in large weight amounts routinely “front’Vgive the narcotics to the purchasers first and then receive the payment at a later date after the purchasers sell the narcotics. Your affiants believed that [appellant] was going to meet with [Lippman] to pay back the currency owed from a previous CDS transaction.
 

 On October 16, 2001[,] at 4:50 p.m., reference is made to call number B-185 which was intercepted as an outgoing call to (443) 386-7433, no subscriber information available. This call is related to the above call B-132. During the conversation, [Lippman] spoke again to [appellant] who stated ‘Where we going?” [Lippman] responded, “I’m going to be at the B-Spot, the music joint.” [Appellant] replied “By the ADT by you then.” [Lippman] stated “Yeah [sic][.]” In this call your affiants believe that [Lippman] was advising [appellant] of an area where they would meet to transact the currency owed. Your affiants believed that the location would be a music store near [Lippman’s] residence.
 

 In response to the above intercepted calls, surveillance units responded to 1303 Colbury Road Apartment E, the home of [Lippman] in anticipation of a meeting and possible drug transaction between [Lippman] and [appellant]. At approximately 4:40 p.m.[,] DEA[
 
 3
 
 ] Task Force Officer Michael Cannon and Detective Keith Gladstone observed
 
 *589
 
 [Lippman] dressed in black pants, black jacket, and wearing a New York Yankee baseball cap leave 1308 Colbury Road Apartment E, and get into his white GMC Envoy. [Lippman] was observed carrying a black shoulder bag as he entered his vehicle. Surveillance units followed [Lippman] as he left his residence, and according to the Detectives following [Lippman], he was observed making numerous counter-surveillance maneuvers while on his way to the meet location. Based on your affiantsf] training[,] knowledge[,] and experience^] these maneuvers are utilized by suspects involved in the distribution of narcotics as a means to detect or elude law enforcement personnel that may be following them. Surveillance units continued following [Lippman] to the Perring Plaza Shopping Center where he parked his vehicle and walked into a Mars Music store. At approximately 5:17 p.m., Detective Burkett and DEA Task Force Officer Isaac Hester observed a black Chevrolet Yukon bearing Maryland registration M169143 [sic] parking beside [Lippman’s] vehicle. Surveillance units observed a black male wearing jeans and white tee shirt (later identified as [appellant]) exit the Chevrolet Yukon and run into the Mars Music store. A check of the Maryland Motor Vehicles Administration revealed that the vehicle is registered to [appellant], of 101 Aspinwood Way, Apartment J[,] Baltimore, Maryland 21237. Detective William Denford followed [appellant] into the music store where he observed him meet with [Lippman]. Shortly thereafter, at approximately 5:22 p.m. surveillance units observed [Lippman] and [appellant] exit the music store and get into the black colored Chevrolet Yukon registered to [appellant]. [Lippman] was observed getting into the front passenger seat of the vehicle and [appellant] getting into the driver[’]s seat. DEA Task Force Officer Michael Cannon observed [Lippman] and [appellant] counting money while they sat in the vehicle. At approximately 5:33 p.m.[,] DEA Task Force Officer Cannon, DEA Task Force Officer Hester, Detective Gladstone, and Detective Burkett observed [Lippman] get out of the Chevrolet Yukon carrying a white plastic bag in
 
 *590
 
 his left hand. According to the Detectives, the bag appeared to be wrapped tightly around the contents and consistent with containing a large amount of United States Currency. Following the surveillance[,] Detectives Denford and Gladstone obtained a MVA photograph of [appellant] and positively identified him as the black male who met with [Lippman],
 

 A Criminal Record Check revealed:[
 
 4
 
 ]
 

 During the course of this Court Ordered Wire Tap, surveillance has been conducted at the location of 101 Aspinwood Way, Apartment J. As a result of the[ ] surveillance[ ] your affiants have learned that [appellant] uses this location as his primary residence. Your affiants have observed [appellant] on a number of occasions staying at this residence. Your affiants have observed persons arriving at 101 Aspinwood Way, Apartment J while [appellant] was home. These unknown individuals would go inside and then return back outside a short time later. Based on your affiants^] training, experience^] and expertise in the field of narcotics, your affiants recognized this activity to be consistent to that of an individual selling narcotics from his dwelling. Your affiants have also observed [appellant] driving in his Chevrolet Yukon where he has been seen at the business owned and operated by [Cantine], the “[Club Bar].” During the surveillance[ ] conducted while [appellant] was at the “[Club Bar,]” your affiants have observed [appellant] meeting with [Lippman], [Cantine,] and other known CDS associates. Based on your affiants[’] training, experience^] and expertise in the field of narcotics, your affiants believe that these meetings were for the purpose of discussing CDS related business. Your affiants have also
 
 *591
 
 observed [appellant] at the “[Club Bar]” where [Cantine] or [Lippman] would get into his Chevrolet Yukon for a brief period of time while he was parked. Based on your affiants[’] training, experience[,] and expertise in the field of narcotics[,] your affiants believed that these meetings were for the purpose of transacting CDS and related proceeds.
 

 Based on the aforementioned intercepted conversations and surveillance[,] your affiants believe that there is sufficient probable cause to believe that there exists a conspiracy to violate the narcotic laws of the State of Maryland between [Lippman], [Cantine,] and [appellant]. Your affiants also believe that [appellant] is presently utilizing the dwelling of 101 Aspinwood Way, Apartment J[,] for the purpose of storage and safe keeping [sic] of CDS, related proceeds[,] and documents. Your affiants also believe that [appellant] is utilizing his 2000 Chevrolet Yukon, bearing Maryland registration of M619143[,] for the purpose of transacting CDS related activity as well as transporting and storing CDS related proceeds and documents. Therefore, as a result of your affiantsf] involvement in this investigation, and based on their training, knowledge[,] and expertise of firearms, narcotics[,] and dangerous drugs, believe that there is concealed within the aforesaid premises[,] listed in the heading of this Affidavit,] those items which are set forth in exhibit A, attached; which items constitute evidence that is related to the illegal Distribution and Possession with the Intent to Distribute Controlled Dangerous Substances as defined by Article 27, Sections 286-302 of the Annotated Code of Maryland.
 

 The requested search warrants were issued by Judge Kathleen Sweeney on November 20, 2001. They were executed the same day and, although no contraband was recovered in appellant’s vehicle, the police found various items during the search of his apartment. Officers seized, in part, a Smith & Wesson .357 revolver, a 9mm semi-automatic Glock handgun, and 531 gel caps containing heroin. Appellant was subsequently arrested and, as noted,
 
 supra,
 
 was indicted in Baltimore City for conspiracy charges and in Baltimore County for
 
 *592
 
 possession with intent to distribute a CDS and possession of a CDS. Following the denial of his motion to suppress and his convictions in both venues, appellant filed his appeal.
 

 LEGAL ANALYSIS
 

 Appellant asserts that the trial court erred by denying his motion to suppress the evidence seized. More specifically, he maintains that the affidavit submitted by Detective Knoerlein failed to establish probable cause as required by the Fourth Amendment and, therefore, that the search and seizure was invalid. Appellant argues that the affidavit was a compilation of unfounded police conclusions which did not provide a substantial basis for a neutral magistrate to believe that contraband would be uncovered in his apartment. Additionally, appellant contends that the good faith exception to the exclusionary rule is not applicable.
 

 “The [F]ourth [A]mendment states that ‘no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized’; it is applicable to the states by the [Fourteenth [A]mendment.”
 
 Birchead v. State,
 
 317 Md. 691, 700, 566 A.2d 488 (1989) (quoting
 
 Mapp v. Ohio,
 
 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). Probable cause means a “fair probability that contraband or evidence of a crime will be found in a particular place.”
 
 Illinois v. Gates,
 
 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983);
 
 McDonald v. State,
 
 347 Md. 452, 467, 701 A.2d 675 (1997). When making a probable cause determination, the issuing court is confined to the averments contained in the search warrant application.
 
 West v. State,
 
 137 Md.App. 314, 322, 768 A.2d 150 (2001). “The judge’s task is ‘simply to make a practical, common-sense decision’ whether probable cause exists; however, ‘his [or her] action cannot be a mere ratification of the bare conclusions of others.’ ”
 
 Birchead,
 
 317 Md. at 701, 566 A.2d 488 (citations omitted).
 

 When reviewing the judge’s decision to issue a search warrant, we do not undertake a
 
 de novo
 
 review, but,
 
 *593
 
 instead, pay great deference to the magistrate’s determination.
 
 West,
 
 137 Md.App. at 322, 768 A.2d 150. Extending great deference to the magistrate’s decision acts as a means of encouraging the police to submit to the warrant process.
 
 State v. Amerman,
 
 84 Md.App. 461, 469, 581 A.2d 19 (1990). “A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment’s strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.”
 
 West,
 
 137 Md.App. at 322, 768 A.2d 150 (quoting
 
 Gates,
 
 462 U.S. at 236, 103 S.Ct. 2317) (citations and internal quotation omitted). Furthermore, in cases wherein it is not easy to determine whether the affidavit demonstrates the existence of probable cause, “ ‘the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.’ ”
 
 Holmes v. State,
 
 368 Md. 506, 520, 796 A.2d 90 (2002) (quoting
 
 Mills v. State,
 
 278 Md. 262, 280, 363 A.2d 491 (1976)).
 

 “Reflecting a preference for the warrant process, the traditional standard for review of an issuing magistrate’s probable cause determination has been that, so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.”
 
 West,
 
 137 Md.App. at 322, 768 A.2d 150 (citing
 
 Gates,
 
 462 U.S. at 236, 103 S.Ct. 2317). The substantial basis standard, which is less demanding than the clearly erroneous standard, operates under the “totality of circumstances” approach, wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another.
 
 Amerman,
 
 84 Md.App. at 472-73, 581 A.2d 19.
 

 The Court of Appeals observed in
 
 McDonald v. State,
 
 347 Md. 452, 701 A.2d 675 (1997):
 

 In
 
 Leon,
 
 the Supreme Court suggested that reviewing courts have the discretion to decide the question of the officer’s good faith, and the applicability of the objective good faith exception, without deciding whether probable
 
 *594
 

 cause
 
 is lacking under the Fourth Amendment.
 
 See [United States
 
 v.]
 
 Leon,
 
 468 U.S. [897], 924-25, 104 S.Ct. [3405], 3421, 82 L.Ed.2d 677 (1984). Justice White first proposed this approach in his opinion concurring in the judgment in
 
 Illinois v. Gates,
 
 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White, J., concurring):
 

 When a Fourth Amendment case presents a novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates, there is sufficient reason for the Court to decide the violation issue
 
 before
 
 turning to the good-faith question. Indeed, it may be difficult to determine whether the officers acted reasonably until the Fourth Amendment issue is resolved. In other circumstances, however, a suppression motion poses no Fourth Amendment question of broad import— the issue is simply whether the facts in a given case amounted to probable cause—in these eases, it would be prudent for the reviewing court to immediately turn to the question of whether the officers acted in good faith. Upon finding that they had, there would generally be no need to consider the probable-cause question. I doubt that our Fourth Amendment jurisprudence would suffer thereby.
 

 Pursuant to the above rationale pronounced by Justice White in
 
 Illinois v. Gates
 
 and reiterated in
 
 McDonald,
 
 we shall immediately turn to the question of whether the officers acted in good faith.
 

 Leon Good Faith Exception
 

 The Supreme Court promulgated the good faith exception in
 
 United States v. Leon,
 
 468 U.S. 897, 918, 104 S.Ct. 3405 (1984), wherein the Court stated that “suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.” The purpose of the exclusionary rule is “to deter police misconduct” and not “to punish the errors of judges and magistrates.”
 
 Id.
 
 at 916, 104 S.Ct. 3405;
 
 West,
 
 137 Md.App.
 
 *595
 
 at 351, 768 A.2d 150. Therefore, evidence acquired pursuant to an invalidated warrant will normally be excluded only if it alters the behavior of the individual law enforcement officers or the policies of their departments.
 
 Leon,
 
 468 U.S. at 918, 104 S.Ct. 3405. In other words, “ ‘[e]ven when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches.’ ”
 
 State v. Riley,
 
 147 Md.App. 113, 130, 807 A.2d 797 (2002) (quoting
 
 Herbert v. State,
 
 136 Md.App. 458, 488, 766 A.2d 190 (2001)) (emphasis omitted).
 

 There are circumstances, however, when the exclusion of evidence remains the appropriate sanction, when an officer has obtained a warrant and abided by its terms.
 
 Leon,
 
 468 U.S. at 922, 104 S.Ct. 3405;
 
 Behrel v. State,
 
 151 Md.App. 64, 100, 823 A.2d 696 (2003). “This is because ‘the officer’s reliance on the magistrate’s probable-cause determination .. . must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.’”
 
 Behrel,
 
 151 Md.App. at 100, 823 A.2d 696 (quoting
 
 Leon,
 
 468 U.S. at 922-23, 104 S.Ct. 3405) (citations and footnotes omitted).
 

 The
 
 Leon
 
 Court concluded that suppression remains appropriate in four situations:
 

 (1) if the magistrate, in issuing a warrant, “was misled by information in an affidavit that the affiant knew was false or would have known was false except for a reckless disregard of the truth,” or (2) “in cases where the issuing magistrate wholly abandoned his judicial role ... (so that) no reasonably well[-]trained officer should rely on the warrant,” or (3) in cases in which an officer would not “manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,” or (4) in cases where “a warrant may be so facially
 
 deficient—i.e.,
 
 in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume (the warrant) to be valid.”
 

 
 *596
 

 Connelly v. State, 322
 
 Md. 719, 729, 589 A.2d 958 (1991) (quoting
 
 Leon,
 
 468 U.S. at 923, 104 S.Ct. 3405).
 

 “Thus, as summarized by the Court, ‘(i)n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.’ ”
 
 Id.
 
 (quoting
 
 Leon,
 
 468 U.S. at 926, 104 S.Ct. 3405).
 

 In the case
 
 sub judice,
 
 appellant avers that the issuing judge abandoned her neutral and detached judicial role by authorizing a search warrant based on an affidavit so lacking in probable cause. Additionally, appellant contends that the police who executed the warrant lacked an objectively reasonable basis for believing the warrant was valid. Although appellant limits his assignment of error to the second and third exceptions in
 
 Leon,
 
 we will briefly address whether the warrant in the instant case falls within any of
 
 Leon’s
 
 four exceptions and thus whether the application of the exclusionary rule is appropriate.
 

 Under the first exception identified in
 
 Leon,
 
 suppression of the evidence would be the appropriate remedy if the issuing magistrate was misled by information contained in the affidavit that the affiant knew was false or should have known was false except for a reckless disregard of the truth.
 
 Leon,
 
 468 U.S. at 923, 104 S.Ct. 3405 (citing
 
 Franks v. Delaware, 438
 
 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). There is a presumption of validity, however, with respect to the affidavit supporting the search warrant.
 
 Franks,
 
 438 U.S. at 171, 98 S.Ct. 2674. In order for the defendant to go beyond the four corners of the search warrant, he or she must conform to the procedures first established in
 
 Franks. Id.
 
 at 171-72, 98 S.Ct. 2674;
 
 McDonald,
 
 347 Md. at 471-72, n. 11, 701 A.2d 675;
 
 Fitzgerald v. State,
 
 153 Md.App. 601, 642-48, 837 A.2d 989 (2003). As the Court of Appeals explained:
 

 In fact,
 
 [Franks
 
 ] set out a procedure, requiring a detailed proffer from the defense before the defendant is even
 
 *597
 
 entitled to a hearing to go behind the four corners of the warrant. Under
 
 Franks,
 
 when a defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included false statements in the supporting affidavit for a search warrant, and that the affidavit without the false statement is insufficient to support a finding of probable cause, the defendant is then entitled to a hearing on the matter. The burden is on the defendant to establish knowing or reckless falsity by a preponderance of the evidence before the evidence will be suppressed. Negligence or innocent mistake resulting in false statements in the affidavit is not sufficient to establish the defendant’s burden.
 

 McDonald,
 
 347 Md. at 472, n. 11, 701 A.2d 675.
 

 Appellant does not argue that Judge Sweeney was misled by information in the affidavit that Detective Knoerlein knew was false or should have known was false. Assuming appellant had mounted such a challenge on appeal, he did not make the substantial preliminary showing as required by
 
 Franks
 
 in order to have a hearing on the matter in the trial court. Without a “taint hearing,” the presumption favoring the validity of the supporting affidavit remains intact and appellant therefore cannot invoke the first
 
 Leon
 
 exception.
 
 Fitzgerald,
 
 153 Md.App. at 642-48, 837 A.2d 989.
 

 Leon’s
 
 second exception permits application of the exclusionary rule if the issuing judge wholly abandoned his or her neutral and detached judicial role so that no reasonably well-trained officer should have relied on the warrant.
 
 Leon,
 
 468 U.S. at 923, 104 S.Ct. 3405 (citing
 
 Lo-Ji Sales, Inc. v. New York,
 
 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979)). The Supreme Court has “repeatedly said that a warrant authorized by a neutral and detached judicial officer is ‘a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime.’ ”
 
 Lo-Ji,
 
 442 U.S. at 326, 99 S.Ct. 2319 (quoting
 
 United States v. Chadwick,
 
 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (internal quotation and citation omitted)). A magistrate loses his or her
 
 *598
 
 neutral status by acting as an adjunct law enforcement officer, participating in the investigation or having a stake in its outcome.
 
 Id
 
 at 327, 99 S.Ct. 2319;
 
 State v. Smith,
 
 305 Md. 489, 518-20, 505 A.2d 511 (1986);
 
 Vandegrift v. State,
 
 82 Md.App. 617, 630, 573 A.2d 56 (1990). For example, “[i]n
 
 LoJi
 
 the determination of probable cause upon an application for a search warrant was made by the Town Justice, but he ‘allowed himself to become a member, if not a leader, of the search party which was essentially a police operation.’ ”
 
 Smith,
 
 305 Md. at 519, 505 A.2d 511 (quoting
 
 Lo-Ji,
 
 442 U.S. at 327, 99 S.Ct. 2319).
 

 Although appellant asserts that Judge Sweeney abandoned her neutral and detached judicial role, he fails to demonstrate how she participated in the police operation. It appears that appellant’s argument is that the application for the search warrant was so devoid of probable cause that Judge Sweeney’s issuance of the warrant constituted an abandonment of her neutral role. The case law, however, indicates that a loss of judicial neutrality occurs only when the issuing magistrate acts as an adjunct law enforcement officer or otherwise directly participates in the police investigation. Whether the warrant application supports a probable cause finding has no bearing on judicial neutrality and, therefore, appellant’s contention fails. Accordingly, we conclude that Judge Sweeney did not abandon her neutral and detached judicial role by issuing the warrant to search appellant’s vehicle and residence.
 

 The third exception under
 
 Leon
 
 requires the suppression of evidence when the supporting affidavit is “ ‘so lacking in indicia of probable cause’ ” that an officer is unable to claim objective good faith in relying on the resulting search warrant.
 
 Leon,
 
 468 U.S. at 923, 104 S.Ct. 3405 (quoting
 
 Brown v. Illinois,
 
 422 U.S. 590, 610-11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). The objective test requires that the officers, exercising professional judgment, could have reasonably believed 1) that the averments of their affidavit related to a present and continuing violation of law, not remote from the
 
 *599
 
 date of their affidavit, and 2) that the evidence sought would likely be found at the location identified in the affidavit.
 
 Connelly,
 
 322 Md. at 735, 589 A.2d 958. Thus, the affidavit cannot be so “bare bones” in nature as to suggest that the issuing judge acted as a “rubber stamp” in approving the application for the warrant.
 
 U.S. v. Wilhelm,
 
 80 F.3d 116, 121 (4th Cir.1996);
 
 see also United States v. Craig,
 
 861 F.2d 818, 821 (5th Cir.1988) (explaining that the third
 
 Leon
 
 exception is often referred to as the “bare bones” affidavit exception). Also, because “application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid.”
 
 Connelly,
 
 322 Md. at 735-36, 589 A.2d 958 (citing
 
 Craig,
 
 861 F.2d at 821).
 

 In the case
 
 sub judice,
 
 the meeting with Lippman in the shopping plaza parking lot to count money, the suspicious foot traffic in appellant’s apartment, the meetings inside the Club Bar and in its parking lot, Lippman’s and Cantine’s criminal backgrounds, and the call placed to Lippman requesting “300 grams,” all create a picture from which the officers could reasonably and objectively believe that a warrant to search appellant’s apartment would be valid. The officers could have reasonably believed that the averments in the affidavit related to a present and continuing CDS violation and that evidence would likely be found in appellant’s vehicle or residence. Consequently, we hold that the warrant application was more than a “bare bones” affidavit and, thus, that the third
 
 Leon,
 
 exception is not applicable.
 

 Under
 
 Leon’s
 
 fourth exception, suppression remains appropriate when the warrant is “so facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume (the warrant) to be valid.”
 
 Id.
 
 at 729, 589 A.2d 958 (quoting
 
 Leon,
 
 468 U.S. at 923, 104 S.Ct. 3405). Therefore, in order to be facially valid, the warrant must identify both the place to be searched and the items to be seized as
 
 *600
 
 well as the criminal statute allegedly violated.
 
 McDonald,
 
 347 Md. at 473, 701 A.2d 675 (citing
 
 Brown v. Dist. of Columbia,
 
 638 F.Supp. 1479, 1488 (D.D.C.1986)). The warrants in the instant case identified appellant’s dwelling at “101 Aspinwood Way, Apartment J” and “his 2000 Chevrolet Yukon, bearing Maryland registration of M619143” as the places to be searched. Additionally, the warrants listed the items to be seized as including, in part, any CDS and paraphernalia, which the warrant stated were in violation of “the Laws of Maryland pertaining to Article 27 Section 276-302 of the Annotated Code of Maryland.” The warrant cannot be said to be “so facially deficient” as to permit the officers to presume that it could not be valid.
 

 For the aforementioned reasons, we hold that the four exceptions enumerated in
 
 Leon
 
 are inapplicable and, therefore, that the warrant passes Constitutional muster pursuant to the good faith exception. Having concluded that the officers acted in good faith in the execution of the warrant, the trial court did not err in denying appellant’s motion to suppress.
 

 JUDGMENTS OF THE CIRCUIT COURTS FOR BALTIMORE CITY AND BALTIMORE COUNTY AFFIRMED.
 

 COSTS TO BE PAID BY APPELLANT.
 

 [1]
 

 . Although omitted from the excerpt from the affidavit, the affidavit began by setting forth Detective Knoerlein’s extensive training, knowledge, and experience as a drug enforcement officer.
 

 [2]
 

 . The affidavit included the criminal history of Lippman and Cantine. Lippman was charged with cocaine possession on August 31, 1999 and was subsequently found guilty. Cantine was charged with cocaine possession on December 1, 1986, but the disposition was unknown. On August 15, 1987, he was charged with possession of cocaine, for which he received probation before judgment, and possession of marijuana, for which he was found guilty. Also, Cantine was charged with possession of heroin on May 15, 1997, but the disposition was unknown.
 

 [3]
 

 . DEA is the acronym commonly used to identify the Drug Enforcement Administration.
 

 [4]
 

 . The affidavit provided appellant’s criminal record, which listed that he had been charged with assault and burglary on October 2, 1995 and theft on March 3,
 
 1996,
 
 but the disposition of those charges was unknown. Appellant was also charged with possession of marijuana on April 26, 1996 but he received a STET.